The Court will set a status and scheduling conference in this matter by separate notice.

**IN RE: Diane Susan WOLFSON, Debtor.**

**Bankruptcy Case No. 17–14388 EEB**

United States Bankruptcy Court, D. Colorado.

Signed August 2, 2017

Jeffrey Weinman, Denver, CO, for Debtor.

## ORDER DENYING APPLICATION TO EMPLOY TRUSTEE'S LAW FIRM

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court on the Application to Employ Lindquist & Vennum LLP as Counsel (the "Firm"), filed by Harvey Sender, the chapter 7 trustee ("Trustee"), in which the Trustee seeks to employ his own firm. The

Bankruptcy Code has not erected a blanket prohibition against a trustee hiring his own firm, but § 327(d) requires a showing that such employment is in the "best interests of the estate." 11 U.S.C. § 327(d). Admittedly, every professional's employment should be in the best interests of the estate, but with this language Congress intended to signal something more is required whenever a trustee wants to keep legal or accounting work "in-house."

■ The term "best interests of creditors" is not defined by the Code, and courts have interpreted this phrase in many different ways. *See Keeping Things In–House: Increasing Scrutiny of the Chapter 7 Trustee's Selection of Counsel*, 55 S. Tex. L. Rev. 665, 676–93 (2014) (discussing various interpretations). Given this ambiguity, it is appropriate to examine the statute's legislative history. *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1178 (10th Cir. 2002) ("If a statute is ambiguous, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history."). The legislative history for the "best interests" test pre-dates the current Code section. In adopting the 1978 Code, legislative history emphasized the need for reform

> "to eliminate the abuses and detrimental practices that had been found to prevail [under the Bankruptcy Act of 1898]. Among such practices was the cronyism of the 'bankruptcy ring' and attorney control of bankruptcy cases. In fact, the House Report noted that '[i]n practice ... the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors.' "

*In re CNH, Inc.*, 304 B.R. 177, 180 (Bankr. M.D. Pa. 2004) (citing H.R. No. 595, 95th Cong., 2d Sess. 92, reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5963, 6053). All of § 327 is aimed at eliminating any appearance of impropriety in the trustee's selection of professionals.

There are additional concerns that arise when a trustee hires himself or his own firm. Judge Friendly summed up these concerns well:

> The reasons are plain enough. The conduct of bankruptcy proceedings not only should be right but must seem right. Even when litigation is likely to be the trustee's chief responsibility, there must always be doubt whether he can make a truly disinterested determination that his own firm, no matter what its overall merit, is best qualified to be his counsel in the circumstances of the particular case. ... Some creditors may doubt, as here, whether a trustee is able to take quite the same objective and critical attitude toward the amount and quality of effort being put forward by his own law firm that he would toward another. On the other hand, in contrast to the situation in this case, there may be instances where creditors would believe the relationship had caused a trustee to be overly litigious. Finally, even the most experienced attorney who becomes a trustee in a complicated bankruptcy can benefit from the advice of an independent general counsel; we need not go so far as the familiar adage concerning self-representation by a lawyer to say that a second head is not without value in such matters simply because the first is exceedingly good.

*Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168–69 (2d Cir. 1966); *accord SEC v. Kenneth Bove & Co., Inc.*, 451 F.Supp. 355, 358 (S.D.N.Y. 1978).

These concerns boil down to two fundamental issues: an appearance of impropriety and a lessening of independent judgment. The appearance of impropriety stems from an appearance of "cronyism." "Stated differently, the Trustee has a fidu-

ciary duty to bring in funds, not friends." *In re Bechuck*, 472 B.R. 371, 377 (Bankr. S.D. Tex. 2012). Admittedly, cronyism may be as prevalent when the trustee repeatedly hires the same two or three outside firms, but the creditors in a given case are less likely to be aware of this fact. They will notice, however, that the trustee has hired his own firm. As a result, the employment may serve to erode creditor confidence. The creditors may see large fee applications filed by the trustee's firm and question whether the trustee will give these applications the same scrutiny he would give to those of an outside firm. The trustee may appear impassive when creditors question whether he should rein in the litigation partners of his firm, who appear more willing to litigate than to find more cost-effective ways to resolve disputes. Creditors may wonder if the trustee is "double dipping" by billing certain tasks as an "attorney" when he might otherwise perform the same task as one of the administrative functions of his job as a trustee.

The other concern is that the trustee might receive less candid and independent advice from inside counsel. Will a partner or associate in the trustee's own firm be comfortable questioning the trustee's strategies and assessments? On the other hand, will the trustee feel free to question his firm's advice?

Undoubtedly, there are benefits to be gained by hiring one's own firm. There is a sort of shorthand in communication developed between members of a firm who work together often and the trustee merely walks down the hall to find his counsel instead of laboring to set a conference call or meeting. These minor benefits, however, are insufficient to overcome Congress' concerns.

With this backdrop, the Court must now construe the "best interests" require-ment. Courts have struggled to define it. Two of the most frequently cited cases on this issue offer different multi-factor tests. In *In re Butler Indus., Inc.*, 101 B.R. 194 (Bankr. C.D. Cal. 1989), *aff'd*, 114 B.R. 695 (C.D. Cal. 1990), the court weighed the following factors:

(1) "where the estate's assets consist principally in causes of action, such as for preferences and fraudulent conveyances, and legal counsel would have to look to the recovery for payment of fees;" (2) "where there is relatively little legal work to perform, which does not merit the effort and expense of hiring an outside law firm;" (3) "where substantial legal action must be taken immediately, and the trustee cannot wait for the completion of the appointment process for outside counsel;" and (4) "where the trustee can demonstrate that such appointment will result in a substantial reduction of costs to the estate."

Solomon, *Keeping Things In–House, supra*, at 679 (summarizing *In re Butler Indus., Inc.*, 101 B.R. 194 (Bankr. C.D. Cal. 1989)).

In *In re Interamericas, Ltd.*, 321 B.R. 830, 834 (Bankr. S.D. Tex. 2005), the court employed the following nine-factor test:

(1)The qualifications of the members of the firm compared to the complexity of the case; (2) Whether the firm is regularly hired by others to handle similar litigation; (3) Whether the anticipated litigation predominantly involves issues of bankruptcy law with which the law firm has particularized expertise; (4) Whether the time commitment required to handle the case is consistent with the size of the firm and the balance of the firm's time commitments; (5) Whether only a nominal amount of work must be performed; (6) The availability of other qualified firms to handle the case; (7) The rates charged by the firm compared

to the rates charged by other qualified firms; (8) Whether there will be material cost savings to the estate; and (9) Other case-specific factors.

*Id.* at 834.

■ The *Interamericas* test focuses too heavily on the qualifications and expertise of the trustee's firm and whether the size and composition of the firm is a good fit for the case. These are important factors to consider in hiring any firm, but they do not help to answer the question of when a trustee should be allowed to hire his own firm. The *Butler* test, on the other hand, narrows the circumstances of when a trustee may hire his own firm and attempts to identify the benefits that an estate may realize by doing so. However, this Court does not find particularly compelling the first factor of the *Butler* test, whether counsel will have to work on a contingency basis, as many firms will accept such employment. Although this would be a persuasive factor if the trustee attempted to find outside counsel to represent him on a contingency basis, but only his own firm was willing to do so. A factor not listed that this Court would also consider compelling is whether the trustee's firm has an area of expertise required by the particular case that other local bankruptcy firms do not have, such as expertise in bond financing or special district litigation. Whether the firm has offices in multiple locations that would be of benefit in a particular case might also be a factor.

■ The problem with any multi-factor test is that the factors are not exclusive and they rarely compel a given result. They do not indicate whether all or even most of the factors must be present. They say nothing about how much weight a judge may or must give to any one factor. In short, they give the appearance of an analytical framework and rigorous analysis, but in reality judges use them to justify the exercise of their discretion. Whenever any decision is discretionary and tied to the particular facts of a case, counsel struggle to predict how a court will rule. When it comes to in-house employment, the best advice this Court can give trustees is that they must show substantial, tangible benefits to the estate that could not be achieved with outside counsel.

Acknowledging its inherent limitations, the Court will nevertheless apply the *Butler* factors to the present Application. As to the first element, the Debtor's schedules indicate that the estate has over $1.3 million in real estate assets and is, therefore, not limited to litigation claims. The Court acknowledges that these assets are subject to claims asserted by the Debtor's ex-husband, as set forth in the Trustee's amended complaint in Adversary Proceeding No. 17–1260. The Trustee's success on these claims will ultimately determine how much estate money will be available to pay administrative expenses, such as counsel fees. Thus, to some extent, the Firm would have to look to recovery in the Adversary Proceeding for payment of its fees. However, the Firm requests compensation on an hourly, not on a contingency, basis. *See In re Marsh*, 2013 WL 4501424, at *7 (Bankr. D. Mont. August 21, 2013) (concluding that trustee's contingency fee arrangement with his firm "assuages the dangers discussed in *Butler* of possible abuse and the appearance of impropriety."). As such, the Court finds that the first element only partially supports granting of the Application.

On the second element, the Trustee concedes that this case will involve substantial legal work, but he counters that the Application meets the third element because this legal work needs to be "accomplished quickly." In some sense, every bankruptcy case requires "quick action." Assets are often declining in value, litigation is com-

pounding the cash burn rate, and the Code charges trustees with the duty of making distributions "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). Any firm the Trustee would hire would need to take swift action. However, the Court is not aware of any time sensitivity in this case that is not present in every bankruptcy case. While issues relating to the Debtor's divorce proceeding have arisen relatively quickly in this case, nothing has occurred on an emergency basis. The Debtor's ex-husband filed a relief from stay motion, but the Trustee had approximately three weeks to secure counsel and respond to it. Thus, the second and third elements do not support granting the Application.

Finally, the Trustee argues that hiring the Firm will likely reduce the estate's costs, given proposed counsel's close physical proximity. As previously stated, this is an insignificant cost savings to the estate. He also points out that one of the Firm's attorneys has prior experience practicing in the Telluride area (where the estate's real estate is located). Given that he is not located there now, such modest benefits resulting from his familiarity with this mountain town do not outweigh the concerns of the appearance of impropriety and of less independent judgment that arise when a trustee seeks to employ his own firm.

On balance, the Court concludes that the Trustee has not demonstrated the sort of special circumstances that would justify hiring his own firm. To be clear, the Court does not question proposed counsel's experience or skill in representing the Trustee in this case. Indeed, the Court believes proposed counsel could ably represent the Trustee. However, the Trustee could easily find comparable skill and experience in outside counsel without raising these policy concerns. Accordingly, it is hereby

ORDERED that the Application is DENIED.